Our next case is number 2211317, Jasmine Adams v. Demopolis City Schools. Sorry, I'm a note taker, so when you just pull all my notes together, I'll be right up. Take your time. It's pretty small. Bring it right up here. Bring it up here. You may have to tilt it this way a little bit too for Judge Hall. Yes. Your Honor, if I may. Do they have a copy? Sometimes you just give them a copy so they can look at it right there. Do they have a copy of what's on here? Not blown up, but just paper copy. That way they don't have to come up here and look at this. Right? Yes. That's how we normally do it. If it's a big document, then y'all can. They got excerpts from the record. Yeah, you can take a look. I don't, but we're going to make it work. Oh, no, but we can. If you're going to do a demonstration, just give them a copy of what's on it so they know. It's just like in a jury trial. Yes, Your Honor. You make a copy. I hate for her not to have a copy to argue from. And a counsel has a copy, Your Honor. They're reviewing it. You have a copy. We want you to have one too. Oh, did you give them? I'm fine, Your Honor. No. Can you present your argument without having a copy? Yes, I can, Your Honor. All right. Then let's proceed. Thank you. Good morning. My name is DeAndra DeBras Zimmerman of DiCello Levitt, and with me is Eli Hare, who is our senior counsel. I would sincerely like to thank the panel for giving us the opportunity to speak on behalf of Mackenzie Adams and her family. Her aunt is in the courtroom behind me today, Edwina. I think one of the most important things that we would like to say today is qualified immunity is a significant issue that we contemplated in advancing this case, in building this record, and in telling Mackenzie Adams' story. This record is rife with incidents of actual notice. This record is rife with testimony from the defendants that they elected to not follow Alabama law. The Jamari Terrell Williams Act was passed so I would not have to stand in this courtroom today. Jamari Terrell was a young African-American man, young boy who was gay. He was systematically bullied in the Alabama school system. He took his life, and the Alabama legislature elected to pass a law not addressing just discipline generally, but to pass a law specifically addressing what we understand to be, in 2022 and 2023, the significant psychological impact on a young child's mind of being pervasively bullied. And so the existence of that act is really central in the qualified immunity analysis and the exceptions to the qualified immunity that we believe did not warrant the lower court's granting of summary judgment. I will say that the weird thing about being a plaintiff's lawyer is you can't go back and fix things. We can't bring Mackenzie Adams back, and we're not asking the court to correct social woes. We're not asking the court to punish teachers or administrators who are acting in their discretionary authority. We are asking the court to apply the law where school officials are not acting in their discretionary authority and where they are acting contrary to Alabama law. I have a question for you about the record. Are the recording of the phone call where Mackenzie told her mom about E.C.'s bullying and any dire entries besides the December 3rd entry, are those in the record? I believe they are, Your Honor. Can you tell me where? I was not able to find those. I'm looking at Eli. I look at it all the time. Can we have a moment to look for that in the record? Maybe he could look while you feel free to keep going while he looks. If Grant would look for it, we are tied to our laptops, unfortunately, which we're not allowed to have. But if we cannot identify that today, we would respectfully ask the panel if we could supplement at a given time to make sure we identify Mackenzie's voice. And thank you for mentioning that, Your Honor. In terms of the record that we built, that Mackenzie speaks to us from the grave. And part of the reason that was an important part of the record, and we're going to talk about the evidence in the record of four months of systematic bullying, was that Mackenzie's mother was ignored. And she had to basically question her daughter and record her daughter because she was trying to convince folks that bullying was indeed occurring.  Yes, Your Honor. My understanding is that with respect to the act that you were talking about, that a model policy was circulated by the State Department of Education in December of 2018, and in February of 2019 the school adopted that model policy. Are you arguing that the school should have done something pursuant to the act prior to the circulation of the model policy? I am, Your Honor. The act gave an effective date. That means the act was supposed to go into law. The schools were supposed to at least convene and begin discussing the application of the law. And to be clear, Your Honor, this is saying you have to have policies and procedures and training by this date. And I understand the lower court's position that, well, this is custom. Generally, the schools will wait until a model rule. But there is an effective date for the implementation of this act. I didn't pass it, the legislature did. And the timing of this is so crucial because had they followed the law, set up a bullying policy, and you may hear today what we heard in the lower court was, we kind of had this policy, we had the Jason Platt suicidal policy, and we mentioned bullying, which also speaks to the foreseeability aspect for the state law claims, right? Had that policy been in place, had those teachers been trained, we would not see the testimony that we have in the record from the vice principal, from the teacher, oh, I don't really remember training. We don't have a training bullying protocol. Even if it was negligent for the school not to adopt the policy when the act's effective date, how is it equivalent to deliberate indifference or intentional misconduct? Well, Your Honor, I think the failure to adopt the act addresses a number of issues, primarily the exception to qualified immunity in this case where you didn't follow the law and so much of the argument is, well, we're acting in a discretionary function in disciplining children, right? And so we're not getting into the sufficiency of what little discipline was there. What we're getting into is the decision to not follow the law and our allegations and the evidence that we've built and the expert that we identified in the record. We have the right to bring that chain of events and that causation chain of events to a jury because they can no longer be cloaked under the protections of qualified immunity. What's your best evidence that the school intentionally did not follow the law? We have testimony in the – can we pull that up? May I approach, Your Honor? And one of the reasons, if I may, as I answer that question, that we did the demonstratives, was to see the record. So, so much has been said that there isn't substantial evidence in the record. And may I approach, Your Honors?  Thank you. Yes. Let's see. And so – And did you – you did not have a policy flagged in the law in 2019? Yeah, here. And so this is evidence of your failure to implement the policy. And so – One difficult problem that you have is that I don't think that for qualified immunity purposes there's a constitutional right for the school to adopt a – a constitutional mandate for the school to adopt a policy in keeping with state law. How do you – how do you draw that connection? I'm not saying it wouldn't have been the right thing to do or the just thing to do, but I don't know that – that I see a case that says that there's a constitutional right that people have for the state to adopt policies according to state law. Well, I – so, I think when we talk about qualified immunity, what I understand are the two exceptions. So, we discussed the discretionary function, and this was not discretionary. And that's part of the qualified immunity, because it's not discretionary because you were mandated by state law to perform these functions as state agents and you did not. And then I think when we look at the language, violated clearly established statutory law as an exception to qualified immunity, that's what we have here. That was the testimony that we had with Kelhoff. We knew it was an act. I mean, in truth, the minute an act is passed, especially as lawyers we have knowledge that the act exists, and the school decided not to implement those policies. If I may continue, Your Honors. And I think earlier, and I know we went in a different direction, just, you know, staying within the standard, when we look at samples, a reasonable fact finder evaluating the evidence could draw more than one inference from the facts. And if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. And so when we look at specifically as it relates to knowledge, specific knowledge of what was happening to Mackenzie Adams during that time, this is not Hawkins, which they cite, where Jane 1 — Jane Doe 1 and 2 said, the aggressor was nasty and disgusting. This isn't a general case. In the record, we have testimony from CJ, who was a child in school with Mackenzie Adams. She was pushed. She was called a nigger. She was called an ugly bitch. Her hair was pulled. And we have testimony after testimony. We have Mackenzie's voice. We have Mackenzie's mother testifying about what she said. We have a child who was in school with Mackenzie. We have the note that was intercepted in October of 2018, where — pardon me — EC targets her, writes this note, and she tries to defend herself. And from a causation element, we have Dr. Geitz, 34 years as a psychologist, ran a hospital facility, 2,000 beds, teaches psychology at the University of Missouri Medical School, explain how these sequence of events led her to a point where she was so desperate that she took her life. But the record is rife with evidence of actual knowledge of what was happening to Mackenzie. And so — Ms. Zimmerman, you're eating into your rebuttal time now, so — Oh, I'm sorry, Your Honor. I'll give it all back to you if you conclude now. Thank you. Both exceptions to Cranman, we believe the record establishes that why they cannot cloak themselves in qualified immunity, we feel we built a proper record. And there were factual determinations made by the Court, which is the purview of the 12 people that we hope to speak to if this Court allows us to continue fighting for Mackenzie Adams. Thank you, Your Honors. Please be seated. Hey, police court. My name is Mark Boardman, together with my law partner, Clay Carr. We represent the defendants in this case, the Demopolis City Schools, represented by their superintendent, who's on the third row, Tony Willis. Also, the previous superintendent, Mr. Koloff, is now the superintendent of the Coleman City Schools, sitting in the first row. Next to him is Ms. Stewart, who is the assistant principal. Next to her is Ms. Mims, who was the teacher in the classroom. And on the end is Ms. Emfinger, who was the principal of the school. And now I can at least see you, Judge Hall, because I'll come over to this side. This is a tragic situation, and there's no way to analyze it other than this. Nobody is — a child died. But in terms of liability, a lot of things to consider. I want to make sure to open with one question, make sure I understand you properly. You said in your red brief that the record showed, quote, at most only childish name-calling and teasing that is inevitable among elementary school students, and, quote, nothing more than adolescent teasing. Do you stand by that characterization? We're trying to follow the language that this Court wrote in Hawkins v. Sarasota County. But this is a different case. So I'm asking for the facts of this case. Do you think it's fair to describe the conduct that way? Yes, Your Honor, and here's why. The — what you have is a lot of testimony from the mother who says this happened, but you don't have confirmation from the students who say this happened, neither the diary, which, of course, nobody knew about at the time, nor the testimony of the six students who were deposed. In fact, of those six students who were deposed, three of them said there was absolutely no bullying at all. I'm not saying it means that you're liable, but there's certainly evidence in the record that she was subjected to sexualized commentary, racial commentary. I mean, I have a 9-year-old. If he heard things like that, I don't think I would consider that normal elementary school teasing. Schools are a different place from when we all went to school, and the biggest problem then was chewing gum or talking in class. If this is ordinary, then that's a bigger problem in this case. I don't think you're going to make it very far by trying to convince me that this is normal things that kids do at school. No, no, I don't want to suggest that. But what I do want to point out is that there is one episode of the use of the N-word, one. It is not repeated. The part about this happening every — twice every week, if you look specifically at the testimony of J.J. on that, J.J. says it happened with other students, does not identify McKenzie. J.J. also was very specific to say that it was always reported to — that he was being mean to other students, not necessarily some other type of gender or racial issue, and that it was reported to Ms. Mims. She took action at that point in time. None of the other students are ever identified by J.J., but the argument made by the plaintiff is this happened twice a week. We don't know what students it was. We don't know what the actions were. We certainly do not have connection to McKenzie in that situation. So — and then the final element of that is that E.C., the student — Go ahead. E.C., the student who was specifically involved, was disciplined. In fact, when he was deposed, he said, look, we were friends. We were just writing this note back and forth to each other. They are using language they probably don't even understand in the fourth grade, but they've heard other people use it. And when they've heard other people use it, they think it has some type of power. In fact, the — the note that Ms. Mims found and pulled out of the garbage can, the one that was all crumpled up, we're assuming that it was written in chronological order. But these are fourth graders. They were writing where there was additional space. And if you listen to E.C.'s — if you read E.C.'s deposition, you'll see he says, I didn't even say some of those things on there, and that's not my handwriting. The point is — Okay. So can I switch gears? I'm — it seems to me that this case is a lot about notice, not whether there's a factual issue as to whether bullying and harassment was going on. As I hear your answer, are you trying to say there was no bullying — at least at question of fact — that there was no bullying and harassment ever going on? You're not trying to say that, are you? No, Your Honor. Okay. So you acknowledge there was bullying and harassing going on of this child? Proper conduct between the students. And it was more than once? Well — It was many times. I don't care whether it was twice a week. It was over a period of at least a year, and it was significant. I'm not going to get into severe pervasive, but it was significant. I — You don't agree with that? The record in the Lighten was favorable. The plaintiff shows that. Right, because she was only in school for — this was December. She'd only been in school since August at that point. She transferred in from the Linden school system specifically to come to the Demopolis — Okay. I'm looking at C.J.'s testimony. I mean, he's saying she was called inward. He heard E.C. do it, make fun of her hair and shoes, pull her hair, and other students. Inward, inward. She saw her. Mims wrote up E.C., went to the office, nothing. He got out of school suspension for a couple of days. C.J. said she would cry. Just sit there, lay her head down. I mean, all of this. They said what was wrong with her, but she wouldn't tell them. She would — and then you've got D, I think, C.J.'s testimony. Then you've got J.W.'s. That was a girl, excuse me. I mean, there's lots of testimony, J.J., okay? E.C. made comments, you're not too dark and stuff like that. He had a reputation for being mean, and they knew — Mims knew about his behavior. He would always get in trouble. He was constantly harassed. I mean, you don't really dispute that there's significant harassing and bullying of this child going on, do you? No, but I want to be specific as to whether — But then we get to whether there's notice, right? Whether how much y'all knew about it. And what the case is really about is actual notice. Potentially. We've got to get past that first part. I want to make sure we're not overstating. I've got the testimony of C.J. here. One time. It's not just one person. It's all of the people. You're going to have a really hard time, I think, convincing us that there is not even an issue of fact on that question. Expensive bullying. In the light, most favorable. In the inferences, it's a very — maybe not overwhelming, but it's certainly enough. It looks to me, at first blush, of that. So the question is, how much did you know? Because it looked like some of this people didn't know about, and then she was asked about it, and she had nothing to say. So help me with that evidence, why there's no actual notice. Well, in particular, when approached on the issue of being pushed, McKenzie said it was just a story. That's also cited in C.J.'s testimony, page 34. She said that it was — so then we go to the issue of what did Ms. Mims know, who has her in one class at a time. We also know that Ms. Stewart took action to say, McKenzie, if you have any problems, you immediately come out of class and you come to my office. That was set up with the grandmother, and then that was told to all the teachers that McKenzie had. So McKenzie had that opportunity. Then Ms. Stewart continued to push through and monitor the situation more closely than she had before. But that shows that Ms. Stewart had actual knowledge of at least some of the bullying, because she took action. It showed she had knowledge of the issues that McKenzie said she was having, and so she's taking action to that. Again, it's not a negligent standard of deliberate indifference. Well, we're not talking about the action that was taken, though. I believe Judge Hull was asking about the notice, and I am too, about the notice of the actual knowledge. The district court did not mention Janice Adams' report to the teacher, Mims. And so that's an instance of also where she was told that the bullying was occurring. Isn't that right? And after that, there were no more incidents reported to Ms. Mims. That was October of 18. And after that, there were no more incidents reported to Ms. Mims. She didn't see any other incidents, none reported to Ms. Stewart or Ms. Hemfinger. And so at that point, on the notice issue, they thought they had resolved what this Court has said that, you know, in the Hawkins v. Sarasota, that case, I know it's a very different case, but, I mean, what that kid said in that situation was John Doe would hold his — cross his arms, congested to a general's, and tell John Doe one, two, and three to suck it. He would hold up two fingers and say that that meant to meet me in bed in two seconds. In the lunchroom, he said he wanted to suck the girl's breast until the milk came out, that he wanted the girls to suck juice from his penis, and that he wanted the girls to have sex with him. On occasion, he referred to one or all of them as sexy baby and said, you have a bond, I have a hot dog, and I want to eat them both. On the playground, he would chase the girls and sometimes successfully try to toss them on their chests and unsuccessfully try to kiss them. At the bus stop, he would try to grab Jane Doe three and look up her skirt. He would also jump on her and rub his body on hers. This conduct took place over several months. This Court ended up ruling that those are incidents well, even assuming the behavior was severe, pervasive, and objectively offensive. It was not so severe, pervasive, and objectively offensive that it has systemic effect on denying the girls equal justice to active education. And cited the part that we just talked about, about the — the teasing, while interacting with other children often exhibit behaviors fully unacceptable to adults. The real world of school discipline is a rough-and-tumble place where the students practice newly learned vulgarities, erupt with anger, and tease and embarrass each other, share offensive notes, and flirt and push and shove in the halls and grab and offend. In the school sitting, students often engage in insults, teasing, shoving, and gender-specific conduct that is upsetting to the students subjected to it. That's the precedent of the Court. So with regard to the — and I need to get back to the one thing that we've — we're not talking about Title IX at this point. We're really talking about the policy that concerns Jamal Terry Williams. We have had an anti-bullying statute in Alabama since 2009. The Jamal Terry Williams amendment — No, that's why it's really troubling here, because this was a lot of bullying and very little action by the school, okay? Say, okay, to the victim, yeah, well, talk to me, Stuart. Now, you let me know if anything's going on again and say, okay, nothing ever happened. So, therefore, you know, this child was clearly traumatized and having problems, and I can't figure out exactly what anybody did other than say, well, let us know, and slapped him on the wrist, basically. Very little. Well, in this — in the case I just cited, that kid — I'm not caring about that case. I'm talking about this case. Right, but — Okay, every case is different. Was that case a suicide case? It was not a suicide case. Oh, okay. Okay. And with regard — A case. This is a suicide case. But with regard to some demonstration — Nine-year-old. — that that suicide is causally linked to these incidents, the grandmother knew nothing about it. The classroom knew nothing about it. The students knew nothing about it. In fact, the student she rode home with said she was normal that day. The teachers all thought she was normal that day. The grandmother had no reason to suspect that that was going on. After the grandmother contacted Ms. Mims, there were no other incidents reported to Ms. Mims. So there's not notice at that point. With regard to the Jamal Terry Williams policy, that policy on bullying was already in effect, had been in effect for almost a decade at that point. The difference with Jamal Terry Williams is that was a 10th grader who died specifically after cyberbullying. And that's why the statute was changed to include cyberbullying. And that's why the statute says the Board of Education, not the schools, not the individual, the Board of Education shall adopt a policy. I'd like you to address Judge Hull's question, which is what specifically did the school do to address the bullying? Because it indisputably knew about some of the bullying. Right. So the action of the school was for the discipline of the students who engaged in any type of misconduct. The pushing and shoving in the hallways, every student says when the teacher saw that, the teacher took action. It was not Ms. Mims. There were unnamed teachers in that. What action did they take? They disciplined the students and told them not to do that. So basically verbal reprimand of the students. Yes, Your Honor. And then with regard to EC, with regard to the note in particular, EC was placed in in-school suspension for two days, counseled over that. And remember his testimony, because we've got his deposition, is, look, we didn't mean anything by it. We were telling your mama jokes back and forth. Those are his words, your mama jokes. And we were using vulgarities because we weren't, we weren't, she was my friend. I wasn't trying to bully her. Then after all that is done, during the time all that is done, the assistant principal says, if you have a problem, come to me, just walk right immediately out of class, and gives all the teachers who teach her the authority to let her go as long as she has to say, I want to go talk to Ms. Stewart. So there's action positively taken. I need to get back to that policy. There was already an existing anti-bullying policy. The Jamar Terry Williams policy, the new one that was supposed to be adopted, which the statute says the Board of Education is supposed to wait for the State Department of Education to give us that information so you can adopt a policy consistent with it. That dealt with cyberbullying. That's not what we have in this situation. And for that reason, the individual argument, the individuals are entitled to immunity. The argument is that there's somehow a morphing qualified immunity and state agent immunity. So is your argument that the school was in compliance with that policy or that the policy is irrelevant? The policy is not causative to the, irrelevant to the suicide. The lack of that policy. No, but no, I'm not talking about the suicide. I'm talking about to the claims here. Is your argument that the policy is irrelevant to the claims or that the school was in accordance with the policy? The school was not in accordance with policy. The change in the policy, as the judge held at the trial court level, would not have altered this suicide because the stuff that was addressed in the existing policy and the one by the statute from 2009 addressed, did not address cyberbullying, which is what the new changes would involve, but did address bullying and that type of stuff, and there was action taken on that ground. Overall, this is a child who's with the schools 35 hours of a 168-hour day, and this is right after the Thanksgiving break. She wasn't even involved in all that time. For that reason, and as tragic as it is, the school system is simply not liable. Neither are the individuals. Thank you very much. Thank you. Thank you, Your Honors. I'd like to address a number of issues. I will say this. The responses today by counsel reflect the testimony from these school officials during their deposition. When asked whether the word bitch was gender specific, I believe it was the vice president that testified that calling a nine-year-old child a bitch was not gender specific. And so that speaks specifically to a clear misrepresentation of the record. This school district, this school system did not adopt a bullying policy. There was a code of conduct that is distinct and different from what was required in terms of having a bullying policy, enforcing a bullying policy in training teachers, and ultimately what was enacted on behalf of Jamari Terrell and his family. When asked about that, it was an attempt to make a distinction about it being online. There is no such distinction in the legislative record of the act or in the act itself. So the record does not reflect a bullying policy that was implemented by the school district. Secondly, this child, E.C., and let me be clear because I deposed that child, is also a victim in this situation partially because of the inaction of the defendants. E.C., in the record, had choked a child, had been disciplined for other wrongful conduct consistently against other children in addition to Mackenzie Adams. And as we saw from today's representations by counsel and the record, no action was taken to protect Mackenzie Adams or to even protect E.C. because he is a child in this system. And if there were a bullying policy in place that had been implemented and had training, there would have been a method to help save Mackenzie's life and to help this other child who targeted Mackenzie. We've heard a lot today about causation. We have a jury system for a reason. We built a record, a strong factual record. We presented an expert. This is not a quack. This is a man 34 years, federal grants, federal programming on how suicide comes to be. And that is allowable because we have done enough to show they are not entitled to the protections of qualified immunity. I've heard a lot about Davis. And the analysis is, was the response clearly unreasonable under the circumstances? It was. Two points. The response to the note where E.C. was disciplined, Mackenzie Adams, who had been targeted for months, was also disciplined. And while factual issues are not before this court, to understand in the world of psychology that deals with child suicide, that was a seminal moment in Mackenzie's decision to take her life because she's being targeted. No one's taking action. She stands up for herself. She answers the note. In response, the school disciplines her along with E.C. But these are questions of fact to which the people of Alabama should be able to be empaneled and make a decision. And this family will live with that decision because we've built a record that gives us the right to move forward and let them say, was this right? But that's not what we're here today. And I think we've established that there are exceptions under qualified immunity, that the school system did not take action, that the school system did not implement a bullying policy, did not train the people under their purview. And in the 30B6 deposition, the testimony of Superintendent Kalhoff, the testimony of Stewart, and I believe part of it was in their job description, it was part of their job description to create, implement these policies and ensure their training. There's nothing in the record that they can point to that shows that they did what they were required to do under state law. And I think I've spoken about the casual link. And something that was said today which is stunning and speaks to the foreseeability component that I think informs even, I think, the wrongful analysis of the decision in Rondini is no reason to suspect because she was smiling. In the limited training that has nothing to do with bullying, the Jason Platt suicide prevention, which you see in the record, little charts that teachers had to fill out, many of the teachers that fill that out wrote bullying as a significant factor in a child committing suicide. So that foreseeability was there. It's in their handwriting. It's in their testimony. It's in the record. And if I may, and I'm sorry I'm past your time, if I may close, Your Honors. You may conclude. Thank you, Your Honors. We're not fools. We understand the protections of qualified immunity. We understand the decisions in Davis and Hawkins. This is an extraordinary set of circumstances where the school did not take action, where the school officials did not comply with the law, ignored the law. And today, with the aunt of the dead child in this room, challenge this panel that Mackenzie did not suffer what she did. On behalf of Mackenzie Adams' family, I want to thank the court for allowing us this opportunity. And by the way, your questions about what she suffered and your comments mean a lot to this family that you acknowledge that her life meant something and that that was established by the record. Thank you.